ASSOCIATED IMPORTS,
INC., Plaintiff,

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, and T.W. Gleason in his capacity as President of International Longshoremen's Association, Defendants.

ASSOCIATED IMPORTS,
INC., Plaintiff,

v.

LOCAL 1814, INTERNATIONAL LONG-SHOREMEN'S ASSOCIATION, AFL–CIO, Defendants.

Nos. 82 Civ. 8589–CSH, 83 Civ. 3529–CSH.

United States District Court,
S.D. New York.

April 3, 1985.

Milberg, Weiss, Bershad & Specthrie & Lerach, New York City, for plaintiff.

Thomas W. Gleason, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge.

In January, 1980, defendant International Longshoremen's Association (the "Union") decided to act on its members' outrage over the Soviet Union's invasion of Afghanistan. It did so by ordering its members not to unload vessels bringing Russian goods into American ports. Plain-tiff Associated Imports, Inc. ("Associated") has for many years imported Russian-made sheet glass for sale in the United States. The sheet glass is shipped through American ports, and several shipments were allegedly on their way when the Union declared its boycott. Plaintiff claims that the Union's refusal to unload not only these but subsequent shipments put it out of business. Claiming that the refusal constituted an illegal boycott under federal labor law, Associated has sued the Union and its president for damages. Associated now moves for summary judgment on the issue of liability. Defendants crossmove for the same relief.

The issue of the legality of the Union's action has been litigated before in other courts. In *International Longshoremen's Association v. Allied International, Inc.*, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982), the Supreme Court held that the Union's refusal to unload ships from the Soviet Union constituted an illegal secondary boycott under § 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4). A secondary boycott consists of the attempt by a union to induce its members to refuse to handle goods with the object of forcing entities with which it has no dispute to cease doing business with an entity with which it has a dispute. *See Allied, supra*, 456 U.S. at 222, 102 S.Ct. at 1662. As a result, it was held that the boycott subjected the Union to suits for damages by those harmed by the boycott under § 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187.

Claiming an identity of issues and parties, Associated seeks summary judgment on the issue of liability by asserting offensive collateral estoppel. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Perhaps acknowledging the force of this argument, defendants did not dispute the applicability of *Parklane* collateral estoppel in their brief and raised only one objection at oral argument. The latter objection was that Associated could have, but did not, join the

original *Allied* action. *See Parklane, supra,* 439 U.S. at 331–332, 99 S.Ct. at 651–652. In their defense defendants instead rely primarily on two independent theories. First, they argue that because the goods in question were manufactured by forced labor, importation of which is illegal, the Union was justified in refusing to unload them. Second, they assert the bar of the statute of limitations.

## I.

The issue of whether Associated could have joined in the prior litigation, the Union's only defense to the application of *Parklane,* is irrelevant to plaintiff's right to summary judgment on the merits. Assuming without deciding that collateral estoppel is available only to parties participating in the prior litigation, the *stare decisis* effect of *Allied* would require me to grant summary judgment in these circumstances. Associated has presented uncontradicted evidence that the boycott which affected it was the same boycott which affected the plaintiff in *Allied.* The Union has not suggested that the boycott did not exist or that it did not affect Associated. Nor has it suggested any facts which might differentiate this case from *Allied. Allied* is controlling on the law. Thus it is unnecessary to apply collateral estoppel or to address issues raised in *Parklane.*

## II.

Of course, the clear applicability of *Allied* is of no help to plaintiff if either of defendants' asserted grounds for summary judgment on their own behalf are meritorious, and it is to these which I now turn.

The Tariff Act of 1930, specifically 19 U.S.C. § 1307, bars the entry into American ports of goods manufactured by "forced" labor, which is defined by the statute as that labor which is not performed voluntarily and is exacted under threat of punishment. Defendants have submitted an affidavit by a Russian emigrant who testifies not only that true pris-

on labor is exacted by the government of the Soviet Union in its notorious Gulags but that Russian laws regarding work put all workers in the position of forced laborers. The latter claim relies on the existence of "anti-parasite" laws, which make criminal an individual's failure to work at a permanent job for a period exceeding four months. These laws, it is claimed, force workers to accept jobs which they would otherwise prefer not to hold. It is also argued that the lack of independent trade unions makes all Russians slaves of the state to some degree. Because the affidavit raises no issues concerning manufacture of glass by prison or Gulag labor, it is only the latter claims which I must consider.

Defendants' argument is, in essence, that because Soviet laborers do not have complete freedom of job selection and of negotiation of terms of employment their labor is "forced." I am skeptical that this is the type of forced labor which Congress had in mind when enacting § 1307. But I do not decide the question because it is not an appropriate one for judicial resolution.

Whether or not *all* Soviet labor should be characterized as "forced" is not a legal question. It is a political question, and highly charged at that, going to the heart of the social contract between the Soviet state and its citizens. Further, because the question affects the commercial access to American markets of one of the world's largest nations,[1] its resolution is inextricably linked to the conduct of American foreign policy. Congress could not have meant a ban under 19 U.S.C. § 1307 of the type proposed by defendants to have been self-executing. Although the statute does not explicitly so state, Congress must have intended to vest the decision of whether a whole nation's goods should be banned in the hands of the executive branch, rather than those of private citizens, or the judiciary at behest of a private citizen's suit. The disruptive implications for American

---

**1.** According to data submitted by plaintiff, in 1979—the year before the boycott—the Soviet Union exported nearly one billion dollars worth of goods to the United States.

trade and foreign policy are—as defendants have proven—otherwise too great.

Although, as noted, the statute does not explicitly vest this power in the executive, it does empower the Treasury Department to develop implementing regulations. The regulations thus promulgated prescribe a means for private citizens to cause specific foreign goods to be declared the product of forced labor and banned. 19 C.F.R. §§ 12.42–12.44 (1984). Because of the disruptive potential of any other course, particularly in these circumstances, I conclude that this is the exclusive means by which the Union could have gained § 1307 sanction for its use of what was otherwise an illegal boycott by seeking the prior approval of the Commissioner of Customs pursuant to 19 C.F.R. § 12.42(b). Indeed, if the Union's true intent was to implement § 1307—rather than to find a *post hoc* justification for an action taken for entirely different reasons—its obvious course would have been to apply to the Commissioner under § 12.42(b). The Union's proposed self-help makes the implementing regulations pointless.

 In sum, foreign goods which are purportedly the product of a national system of forced labor are not barred from entry into the United States under 19 U.S.C. § 1307 until the executive branch declares, pursuant to the regulations set out at 19 C.F.R. §§ 12.42–12.44, that in fact the goods are the product of forced labor. Because the glass in question has never been so declared, Union members would not have assisted an illegal act by unloading it. The defense is unavailable.[2]

## III.

Defendants' statute of limitation argument relies on *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), in which the Supreme Court assigned a six-month federal statute of limitations to suits brought under § 301 of the LMRA, 29

U.S.C. § 185, charging breach of a duty of fair representation by a union. It is claimed that the reasoning which led the Court to apply this statute of limitations to this type of § 301 action applies equally to actions under § 303. The few decisions bearing on the issue are split. *Monarch Long Beach Corp. v. Soft Drink Workers*, 593 F.Supp. 384 (E.D.N.Y.1984), *appeal argued*, 762 F.2d 228, (2d Cir.1985) (applying six-month statute to § 303 claims and citing two unpublished decisions in accord); *Park Electric Co. v. International Brotherhood of Electrical Workers*, 593 F.Supp. 1060 (N.D.Ill.1984 ) (contra).

Prior to *DelCostello*, it was uniformly assumed that § 303 actions were governed by some analogous state statute of limitations, although, as defendants point out in their helpful and comprehensive summary of past authority, precisely what type of statute should apply was a matter of disagreement. By contrast, in *DelCostello* it was held that the particular action then before the Court should be governed by the six-month limitations period set by federal law for the filing of an unfair labor practice complaint with the National Labor Relations Board, § 10(b) of the NLRA, 29 U.S.C. § 160(b). Defendants seem to argue in part that because secondary boycotts are unfair labor practices § 10(b) should apply. Since the filing of defendants' brief the Second Circuit has implicitly rejected such a mechanical rule. *O'Hare v. General Marine Transport Corp.*, 740 F.2d 160, 168 (2d Cir.1984). It is therefore necessary to examine the reasoning of the *DelCostello* decision closely to properly evaluate the claim that it applies here.

*DelCostello* involved an action by a discharged employee jointly against his employer for breach of the collective bargaining agreement and his union for failing to represent him properly during hearings concerning his discharge. The Court began its decision by reaffirming the general rule that the initial resort for a statute of

---

**2.** Even if the importation of such glass was an illegal act, it is arguable that this is no defense to a § 303 action. *See Consolidated Express,*

*Inc. v. New York Shipping Association, Inc.,* 602 F.2d 494, 508 (3d Cir.1979).

limitation when none is specified in federal law is to the analogous state rule. *DelCostello, supra,* 103 S.Ct. at 2287; *see also id.* 103 S.Ct. at 2294 ("resort to state law remains the norm"). However, "it may be inappropriate" to follow the general rule if the resulting statute of limitations is "at odds with the purpose or operation of federal substantive law." *Id.* 103 S.Ct. at 2289.

In applying its analysis, the Court first turned to the available state analogs, finding three. The first of these, an action to vacate an arbitration award, was found to resemble only marginally a breach of duty of fair representation action and to afford, in most states, an unduly brief limitations period. It was noted that because of the plaintiff's need to find counsel and marshal his case against the union, this type of § 301 action requires considerably more preparation than an action to vacate. *Id.* 103 S.Ct. at 2291–92. On the other hand, the other analogs, breach of contract and legal malpractice actions, were found typically to provide excessively long periods unsuited to the need for relatively rapid resolution of labor disputes. *Id.* Only after exhausting these alternatives did the Court turn to § 10(b), which it found uniquely to balance the national interest in speedy resolution and the employee's interest in vindicating his rights. *Id.* 103 S.Ct. at 2294, *citing United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 70–71, 101 S.Ct. 1559, 1567–1568, 67 L.Ed.2d 732 (1981) (Stewart, J., concurring).

■ The analysis of any claim that federal, not state, law should provide the statute of limitations in a similar case must follow a similarly structured analysis. As the Court noted in closing *DelCostello:*

"We stress that our holding today should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere. We do not mean to suggest that federal courts should eschew use of state limitations periods anytime state law fails to provide a perfect analogy. See, *e.g., Mitchell,* 451 U.S., at 61, n.

3, 101 S.Ct. at 1563, n. 3. On the contrary, as the courts have often discovered, there is not always an obvious state-law choice for application to a given federal cause of action; yet resort to state law remains the norm for borrowing of limitations periods. Nevertheless, when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking, we have not hesitated to turn away from state law."

103 S.Ct. at 2294. In other words, only if the state analog is particularly unsuitable is it necessary to look at federal alternatives.

■ The issue of which state cause of action is the most appropriate analog to a secondary boycott has not been settled in our circuit. Two decisions from this Court, *Peterson v. Associated Musicians of Greater New York, Local 802,* 69 Lab.Cas. (CCH) ¶ 13,180 (S.D.N.Y.1972) and *Rondout Electric, Inc. v. International Brotherhood of Electrical Workers, Local 215,* 77 Lab.Cas. (CCH) ¶ 11,108 (S.D.N.Y.1975), have borrowed the New York State statute of limitations for rights created by statute, N.Y.Civ.P.L.R. § 214(2). Neither decision detailed its reasons for choosing this particular statute rather than any other. Courts outside this circuit have followed a number of other guides, perhaps most appropriately the period of limitations for tortious interference with contract. *Park Electric Co., supra,* 593 F.Supp. at 1064. In New York, this tort is also governed by N.Y.Civ.P.L.R. § 214. *Piracci Construction Co. v. Skidmore, Owings & Merrill,* 490 F.Supp. 314, 317 (S.D.N.Y.1980).

Defendants do not expressly challenge the propriety of these specific alternatives. Their primary grounds for urging adoption of § 10(b) are that it would provide a uniform nation-wide rule as a substitute for the varied periods which prevail now in

§ 303 cases and that it is a better analogy to a § 303 action than the proposed state alternatives.

■ The first concern—a quest for uniformity—is foreclosed by *DelCostello* itself. In the extract from *DelCostello* quoted above the Court makes clear that state statutes remain paramount authority when consistent with Congressional intent. 103 S.Ct. at 2289, 2294. Its decision points out the problem of nonuniformity which such an approach necessarily entails. 103 S.Ct. at 2292 n. 18. The choice to reaffirm the general rule was thus made with an awareness of and, presumably, a tolerance for the nonuniformity which will result. Indeed, it was not their diversity which the *DelCostello* Court found objectionable in the myriad time periods cited in footnote 18 but their length. Although in the abstract uniformity is a desirable goal, it does not alone justify substituting federal for state law. Lack of uniformity is a necessary consequence which Congress and the Court have chosen to accept.[3]

■ Defendants' second contention—that the filing of an unfair labor practice complaint, governed by § 10(b), is a better analogy to § 303 lawsuits than the available state analogs—puts the cart before the horse. *DelCostello* does not seek the best analogy from among all federal and state possibilities. Rather it considers only state statutes of limitation so long as those are consistent with the federal purpose. 103 S.Ct. at 2289. I find the available state alternatives to be so and do not reach § 10(b).

In the first place, the nature of the wrongs governed by state and federal law are sufficiently similar for the state causes of action to be acceptable analogies to the federal. The concept of a right created by statute is accurate, if extremely general.

Interference with contract is more precisely on target. A secondary boycott is both effective and unlawful precisely because it disrupts the business relations of two parties. It is an interference by one party with the contractual relations of two others. Although this is not a perfect analogy to the typical interference claim, generally inducement of breach of contract, it is comfortably close.

It is important in this connection to recall why an analogous state cause of action is sought: to assure that the length of time provided by the applicable statute of limitations is tailored to serve the needs of the federal cause of action. It is assumed that similar causes of action will be supported by similar policies and have similar statute of limitations needs. Viewed in this light, it is arguable that a catch-all statute of limitations for rights created by statute such as N.Y.Civ.P.L.R. § 214(2) is too general to give assurance that it serves purposes similar to those of § 303. The cause of action for interference with contract, however, is quite similar to a § 303 secondary boycott claim, and its statute of limitations needs are likely to be similar. *See Park Electric Co., supra*, 593 F.Supp. at 1064.

The Supreme Court in *DelCostello* did not restrict its analysis to the similarity of the causes of action but examined the actual limitations periods which these invoked to assure that they in fact did serve federal policies. *See* 103 S.Ct. at 2291–93. As noted above, in New York a cause of action for interference with contract is given a three-year limit. N.Y.Civ.P.L.R. § 214(4). Contrary to defendants' arguments, this is not inconsistent with federal policy in this area. The virtue of § 10(b) is its brevity. The Supreme Court found this appealing in the context of *DelCostello* because of the importance of quickly settling disputes

---

**3.** Following defendants' logic to its conclusion would require applying § 10(b) to, at a minimum, all § 301 and § 303 suits. This option is foreclosed, however, by *O'Hare v. General Marine Transport Corp.*, 740 F.2d 160, 167–68 (2d Cir.1984), in which a state statute of limitations was applied to a § 301 action which involved only an employer and employees, not a union. This, too, was undoubtedly done with an awareness of the nonuniformity which would result.

which challenge the legitimacy of the grievance and arbitration procedure which ordinarily governs employer-employee relations. *See* 103 S.Ct. at 2292–93, *quoting Mitchell, supra,* 451 U.S. at 63–64, 101 S.Ct. at 1564–1565. Section 301 breach of duty of fair representation actions are inevitably disruptive of day-to-day labor relations, for they challenge the normal dispute resolution procedure as well as the good faith of both employer and union. In addition, because they may involve interpretation of the collective bargaining agreement, such suits may introduce uncertainty into employer-employee relations. Quick resolution is important.

Section 303 secondary boycott actions, on the other hand, are entirely different creatures. Ordinarily resolution of such suits is urgent only while the boycott continues. At this time it is the plaintiff's, rather than defendant's, interests which are threatened by delay, a fact which insures prompt suit. Once the boycott has ended, the effect of suit is primarily financial. Frequently, as in the case at hand, the plaintiff is an employer with which the union has had no labor dispute. Unlike a § 301 suit, the subject of a § 303 suit is thus not day-to-day shop conduct but past actions which are by definition abnormal. Resolution of the suit does not involve interpretation of the governing bargaining agreement, nor does it involve the grievance or arbitration machinery. For a number of reasons, then, the factors which dictate an abnormally short limitations period in § 301 breach of duty of fair representation lawsuits are not present here. The statute of limitations governing the analogous state law claim is acceptable; I need not reach the issue of § 10(b).

Plaintiff's motion for summary judgment on liability is granted. Defendants' motion for summary judgment is denied. The parties are directed to proceed with discovery on the issue of damages in accordance with the terms of the enclosed order.

It is SO ORDERED.