ALLIED INTERNATIONAL, INC.,
Plaintiff, Appellee,

v.

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL–CIO,
Defendant, Appellant.

ALLIED INTERNATIONAL, INC.,
Plaintiff, Appellee,

v.

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL–CIO, et al.,
Defendants, Appellees.

Local 799, International, Longshore-
men's Association, AFL–CIO,
Defendant, Appellant.

Nos. 86–1947, 86–1987.

United States Court of Appeals,
First Circuit.

Argued Feb. 4, 1987.

Decided March 23, 1987.

Ernest L. Mathews, Jr. with whom Thomas W. Gleason, Kevin Marrinan, and Maura R. Cahill, New York City, were on brief, for Intern. Longshoremen's Ass'n, AFL–CIO.

Joseph T. Doyle, Lecomte, Barber, Emanuelson, Tick & Doyle, Boston, Mass., Charles R. Goldburg and Diana Graham, New York City, on brief, for Local 799, Intern. Longshoremen's Ass'n, AFL–CIO.

Danielle E. DeBenedictis with whom Michael T. Cetrone, Stephen J. Brake, Jennifer A. Parks, Valerie C. Samuels, and Nutter, McClennen & Fish, Boston, Mass., were on brief, for Allied Intern. Inc.

Before CAMPBELL, Chief Judge, ALDRICH and SELYA, Circuit Judges.

SELYA, Circuit Judge.

This litigation has occupied the attention of an assortment of tribunals (including our own) for several years. In this, the latest chapter of what has become an enduring saga, the International Longshoremen's Association (ILA) and its Boston-based affiliate (Local 799) appeal from a judgment of the United States District Court for the District of Massachusetts awarding substantial money damages in favor of Allied Plywood Corporation (APC). The defendants-appellants will be sometimes collectively referred to herein as "the union."

We briefly review the tortuous procedural history of this case. Following the onset of the union's boycott of Russian goods (described *post*), APC's predecessor-in-interest, Allied International, Inc. (Allin), brought suit against the present appellants, but without immediate avail. Allin's complaint under 29 U.S.C. § 158(b)(4)(i)[1] was dismissed by the district court for failure to state a cognizable claim. *See Allied Int'l, Inc. v. International Longshoremen's Ass'n*, 492 F.Supp. 334 (D.Mass. 1980). We reversed, ordering the matter reinstated. *Allied Int'l, Inc. v. International Longshoremen's Ass'n*, 640 F.2d 1368 (1st Cir.1981). On certiorari, the Supreme Court affirmed our ruling, holding that the complaint stated a cause of action.

---

1. 29 U.S.C. § 158(b)(4)(i) provides in substance:
 (b) It shall be an unfair labor practice for a labor organization or its agents . . .
 \* \* \* \* \* \*
 (4)(i) to engage in, or to induce or encourage any individual . . . to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; . . . .

*International Longshoremen's Ass'n v. Allied Int'l, Inc.,* 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982). While this skirmishing was ongoing, Allin filed a remonstrance before the National Labor Relations Board (NLRB) arising out of the same factual mosaic. The NLRB, *see International Longshoremen's Ass'n,* 257 N.L.R.B. 1075 (1981), found that the interdicted conduct constituted an unfair labor practice in violation of 29 U.S.C. § 158(b)(4)(i), quoted *ante* n. 1.

These proceedings, collectively, formed the basis for the continued pursuit by Allin of its claims against the union. The district court subsequently found both the ILA and Local 799 liable, and granted partial summary judgment to that effect. *Allied Int'l, Inc. v. International Longshoremen's Ass'n,* 554 F.Supp. 32 (D.Mass. 1982). Thereafter, before any trial on damages, Allin moved to amend the complaint to substitute APC as the named plaintiff. That motion was granted over objection.

No party interposed a timely demand for empanelling of a jury. Fed.R.Civ.P. 38(b).[2] At the ensuing bench trial, the district court held, *inter alia,* that damages in the nature of lost profits were recoverable, and that, on the evidence presented, lost profits were ascertainable with a reasonable degree of certainty through January 31, 1984. *Allied Plywood Corp. v. International Longshoremen's Ass'n,* 123 L.R.R.M. (BNA) 2455, 2458 (D.Mass.1986) [Available on WESTLAW DCTU database]. Finding the plaintiff's proven damages (including but not limited to lost profits) to be in the sum of $8,055,490, *id.* at 2460, the court entered judgment for that amount, plus prejudgment interest. *Id.* These appeals followed.

Liability is not in dispute at this stage. And, although the appellants have served up a bouillabaisse of arguments as to damages, many of their asseverations are so bereft of substance that we need not savor them at any length. We will discuss only those assignments of error which provide some food for serious thought.

## I.

The union's flagship contention is that the trial judge erred in permitting amendment of the complaint. The appellee first moved to amend on June 12, 1985. The amendment was narrow: it sought only to change the party plaintiff. The appellants argue that this added an entirely new claim to the case—the claim for APC's lost profits. This new claim, the union's thesis runs, was time-barred when initially asserted, *see* M.G.L. c. 260, § 2A (three year statute of limitations for actions in tort), and should not have been allowed.

We must set this aspect of the matter into perspective. Allin began importing wood products from the U.S.S.R. over a decade ago. On January 9, 1980, the ILA flexed its political muscle and declared a boycott of all Russian cargo entering at United States ports. Its edict called for "immediate suspension in handling all Russian ships and all Russian cargoes in ports from Maine to Texas and Puerto Rico where ILA workers" were responsible for offloading. Union members, by and large, followed the ILA's lead with the same enthusiasm as the Irish citizenry displayed in ostracizing the English land agent, Captain Charles C. Boycott (the man whose name has come to be synonymous with concerted refusals to deal). Local 799 was a willing —indeed, eager—participant in this effort.

When the union mounted the boycott in 1980, Allin was actively engaged in the business of importing and distributing Russian lumber products. APC had not yet appeared on the horizon. Contending that its business had been, and was being, ravaged by the boycott, Allin brought the instant suit on March 28, 1980. Some thirteen months later, all of the assets of Allin were sold to APC, an unrelated corporation. As part of this transaction, Allin assigned its claims against the union to

---

**2.** We need not discuss the appellants' beseechment that they were deprived of their right to a jury trial on the "new" claim asserted by the amended complaint. The long and short of it is that they never served "a demand therefor in writing" within the time allotted in Rule 38(b)— or thereafter, for that matter—as to either the first complaint or the amended complaint.

APC in their entirety. On the record before us, the conclusion is inescapable that all of the material facts concerning the assignment, the sale of the assets of Allin to APC, and the overall method and manner in which the latter thereafter ran the shop, were known to the defendants.

The business continued as before under the new ownership and within the new corporate shell. No major operational aspect of the enterprise was altered in consequence of the sale. For the most part, the same employees managed the business from the same locus in much the same way as had theretofore been the case. Meantime, the ILA, its zeal unabated, remained intransigent. The boycott endured for some weeks past the date of sale. Though the hands-off policy was interrupted at certain times and in certain ports by, for example, judicial injunctions, the ILA did not rescind its orders concerning Russian cargo until June of 1981.

The litigation between the distributor and the union proceeded after the sale as it had before. It was not until June 12, 1985 (some four months prior to the start of trial) that the district court granted a motion to amend the complaint to substitute APC as the party plaintiff. The revision was nominal in the most literal sense of the word: the amended complaint restated verbatim the factual averments and prayers for relief contained in the original complaint which Allin had filed; the only change was to delete the references to Allin *qua* plaintiff and to insert in their place references to APC.

Although the matter is not free from doubt,[3] we assume arguendo that the effect of amending the complaint was, as the union contends, to add a new claim for APC's boycott-related lost profits. The parties—who agree on little else—concur in their assessment that M.G.L. c. 260, § 2A controlled, and that the applicable limita-

tions period was three years from the time the cause of action accrued. Inasmuch as any neoteric claim asserted by APC arose out of the unlawful boycott which ended in June 1981, such a claim would have been time-barred unless, under Fed.R.Civ.P. 15(c), it related back to the date when the suit was first started.

We look initially to Rule 15(c) itself. The rule provides in pertinent part that:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

Fed.R.Civ.P. 15(c).

■ Although the relation back of amendments switching plaintiffs—as opposed to defendants—is not explicitly treated in Rule 15(c), "the attitude taken in [the rule] toward change of defendants extends by analogy to amendments changing plaintiffs." Fed.R.Civ.P. 15(c) advisory committee note. Thus, when revision of a complaint has the effect of substituting a fresh plaintiff for the original one, three requirements must be met if the former's claim is different and is to relate back: the amended complaint must arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original

---

**3.** The appellee has argued that as the purchaser of the business and assets of Allin and as its assignee anent damages, APC was making no "new" claim when it became the named plaintiff in its own right. As APC sees things, it was merely continuing to assert the claims originally made by Allin; the case involves a single un-

dammed stream of harm, the essential characteristics of which were totally unaffected by the change in ownership of the business. Because we find no preclusion of the suit even if two separate claims are involved, *see* text *post*, we express no opinion on the appellee's alternative theory.

pleading; there must be a sufficient identity of interest between the new plaintiff, the old plaintiff, and their respective claims so that the defendants can be said to have been given fair notice of the latecomer's claim against them; and undue prejudice must be absent. *See Raynor Bros. v. American Cyanamid Co.*, 695 F.2d 382, 384–85 (9th Cir.1982); *Staren v. American Nat'l Bank and Trust Co.*, 529 F.2d 1257, 1263 (7th Cir.1976); *Unilever (Raw Materials) Ltd. v. M/T Stolt Boel*, 77 F.R.D. 384, 390–91 (S.D.N.Y.1977). *See also* 3 J. Moore, *Moore's Federal Practice* ¶ 15.15 [4.–2] (2d ed. 1984). We examine each of these factors in turn.

In this case, it is clear beyond peradventure that APC's claim for its lost profits depended upon exactly the same facts as were set out in the original complaint. Indeed, other than the change in the plaintiff's identity, no new allegations were made. The conduct complained of was precisely the same: the illegal boycott which had begun in 1980 and which had continued, albeit in fits and starts, until after the sale of the business. The boycott was the proximate cause of the harm to the enterprise, whosoever the owner may have been. The liability issue, as to which summary judgment had been granted before the switch of parties was effected, *see* 554 F.Supp. 32, was identical vis-a-vis the "old" and the "new" claims. There was no *qualitative* difference between the claims, merely a temporal one: the "new" claim for lost profits related to a later time period, but nonetheless depended upon the effects of the earlier conduct—the very conduct that sparked the original suit. Indisputably, Allin's claim for boycott-related damages (of which APC was the assignee) and APC's claim for such damages in its own right, grew out of precisely the same nucleus of operative facts. The seeds of both blossoms were sown in a single planting.

Next, there was evidence of a sufficient identity of interest between Allin and APC to warrant invocation of the prophylaxis of Rule 15(c). After all, APC purchased all of the assets of Allin and continued to operate the affected business after the sale in the same manner as before. In the process, APC acquired Allin's claims—past, present, and future—against the union. On the record before the district court, there was an ample basis for a finding of identity of interest. *Cf. Abreen Corp. v. Laborers' Int'l Union*, 709 F.2d 748, 753 (1st Cir. 1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 702, 79 L.Ed.2d 167 (1984) (where all assets and rights affected by the litigation were transferred to the current party, the difference in legal entities is unimportant to the case); *Cyr v. B. Offen & Co.*, 501 F.2d 1145, 1154 (1st Cir.1974) (where there is overall continuity in the operation of a business, products liability can be imposed on a successor corporation which did not exist on the date of manufacture). And, as has been highlighted by our discussion of the way in which the two causes of action arose out of the same conduct and occurrences, *see ante*, there was a close relationship between the claims themselves. One can plausibly view Allin's lost profits and APC's lost profits as two halves of a single semester in the school of hard knocks.

We are in full agreement with the district court that the union was on clear notice of *all* of the actual claims from the inception of the suit. From the very start, lost profits had been claimed without limit of time. Indeed, the original complaint told the defendants that substantial damages had been incurred, that damages were continuing to mount, and that future damages in large dollar amounts were in the offing. By way of illustration, both the original and the amended complaints contained the following (identical) averment:

> As a result of the aforesaid conduct of defendant ILA and defendant Local 799, [the plaintiff] has been damaged in the amount of $5 million dollars to date and faces prospective damages of upwards of $10 million dollars.

Complaints (original and amended) at ¶ 49.

By means of such statements in the original complaint and in the early days of pretrial discovery, the defendants were fairly apprised, well within the applicable limitations period, that the thrust of the litigation was to hold them responsible for

all damages sustained by the importation and distribution business in consequence of the continuing refusal to offload. The complaint, by its terms and tenor, made no distinction as to *when* those damages had been, or might be, incurred. If the defendants drew a contrary conclusion (a supposition which the district court had difficulty in swallowing, *see* 123 L.R.R.M. at 2456), they acted without a reasonable basis—and thus, at their peril. And, having learned contemporaneously of the sale of the business, the union had every reason to believe that APC, in its own right, would be seeking to recover whatever damages were attributable to the post-sale period.

The final leg of the Rule 15(c) journey involves questions of fundamental fairness. The trial judge, in allowing the motion, found no cognizable prejudice. We review his determination in this respect only for abuse of discretion. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Having done so, we conclude that no error was committed.

We have painstakingly perused the record, and find no credible hint of the prejudice of which the union now complains. As we have previously mentioned, the defendants were on notice of the full extent of their potential liability from the earliest stages of the litigation. They had a protracted period within which to conduct their discovery. They utilized this period generously. Once the complaint had been amended to bring in APC, approximately four months elapsed before the start of trial. There was abundant time, even then, within which to carry out supplementary discovery if the nominal revision to the pleadings legitimately dictated further inquiry. Yet, the appellants did not lift a finger. They did not move for postponement of the trial. They asked for no adjournment or continuance during trial in order to meet what they now characterize as a "new" claim. They have no basis to contend that evidence disappeared with the passage of time. Any claim of prejudice under such circumstances is necessarily a feeble one. *See Hill v. BASF Wyandotte Corp.*, 782 F.2d 1212, 1213–14 (4th Cir. 1986) (no undue prejudice where defend-

ants aware long before trial of the nature of the claim and of the parties in interest); *Goldenberg v. World Wide Shippers and Movers*, 236 F.2d 198, 200–01 (7th Cir.1956) (no prejudice where amendment increased the amount of damages, but did not change a single issue in the case and defendant had ample time to discover specific damages claimed).

The sockdolager, if one is required, is simply this: discovery was still open—and ongoing—when the district court permitted amendment of the complaint. As the district judge perspicaciously observed, even "[i]f the defendant was led to believe to its prejudice that only the lost profits up to the point of sale were claimed, such prejudice was obviated by the time that elapsed between the amendment and the actual beginning of the trial." 123 L.R.R.M. at 2456. Certainly, at the time of the amendment, or within a few weeks thereafter, the union knew beyond the shadow of a doubt the full ramifications of the claim which APC was asserting. In early July of 1985 —while discovery was still open and some months before the start of the trial—APC supplemented its answers to interrogatories and laid out the details of its claim in substantially the fashion that it subsequently attempted to prove those damages at trial. The filing set forth a detailed exposition of actual lost profits and out-of-pocket costs incurred to 1985, and an exegetic account of projected losses thereafter (through 1989). Armed with such knowledge, the defendants remained inert. We take this as a plain indication that, as they saw it, they needed to do nothing further to prepare their case.

The absence of prejudice was matched by the absence of surprise. The district judge observed that the union "presented a fully articulated defense with respect to the entire period claimed," 123 L.R.R.M. at 2456, including the period from the date of sale forward. The record bears true witness to this conclusion. The appellants' current claim that, notwithstanding the expansive language of the complaint, they were somehow lulled into believing that the plaintiff was pressing a claim only for profits to the

date of the sale rings hollow in the face of such a finding.

The shortest answer to the "surprise" contention, of course, is that if the union did assume that only a closed period of damages was being pursued, the assumption was a totally unreasonable one. The slightly longer—but no less definitive—answer is that pretrial discovery plainly pointed to a diametrically opposite conclusion. We need not detail all the indicia which our inspection of the record has revealed, though we have set out a representative sampling in the margin.[4] It suffices to say that not even the most sanguine litigant, faced with such adversarial contentions and mindful of the claims limned in both the original and the amended complaints, could reasonably have deduced that no damages were being sought beyond April 1981.

To this moment, the appellants have failed to specify a single relevant item of discovery which they both needed to meet the amendment and were precluded from getting by time constraints or otherwise. Perfervid rhetoric notwithstanding, there was no unfairness here. APC's claim "arose out of the conduct ... set forth in the original pleading," Fed.R.Civ.P. 15(c); the defendants, within the limitations period, had "received such notice" of the claim that they were not "prejudiced in maintaining [their] defense on the merits," *id;* and the defendants should have known that, as to the claim for damages accruing after the sale of the business and Allin's assignment of its chose in action to APC, the suit

should be maintained in the latter's name. There is ample record support for the lower court's finding that the appellants were on fair and timely notice of APC's "new" claim, and were neither prejudiced nor surprised thereby. The disputed claim thus related back to the date the litigation started, Fed.R.Civ.P. 15(c), thereby averting the proffered limitations defense.

 Even on the appellants' "two-claim" hypothesis, *see ante* n. 3, the asseveration that the motion to amend was improvidently allowed comprises much cry and little wool. The district court did not abuse its discretion in permitting APC to be substituted as the party plaintiff.

## II.

 A plaintiff in a § 303 suit[5] has a duty to minimize damages if it is reasonably possible to do so. *Vulcan Materials Co. v. United Steelworkers of Am.,* 430 F.2d 446, 458 (5th Cir.1970), *cert. denied,* 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971). The appropriateness of efforts to rehabilitate and cure must be evaluated under the totality of the circumstances which pertain in each individual case. *Eazor Express, Inc. v. International Bhd. of Teamsters,* 520 F.2d 951, 969 (3d Cir.1975), *cert. denied,* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976). Inasmuch as the possibility of mitigation is in the nature of an affirmative defense, it is the defendants who bear the burden of proving by a fair preponderance that an injured party failed

---

4. Computer printouts produced by the plaintiff in early 1983 (in response to a Rule 34 demand) detailed sales and gross profits on the Russian wood business, by customer and by time interval, well past the date of the transfer of ownership. Interrogatory answers filed in mid–1983 computed damages into 1983, and advised that further compilations were ongoing. In responses to the ILA's second set of interrogatories, served September 28, 1983, the defendants were told that the plaintiff would attempt to introduce testimony on "pre-boycott projections (through 1986) for growth in Allied's sales and profits," and as to "the amount of sales and profits which Allied would have made during the boycott and post-boycott years, projected through 1986, ... [as contrasted with] the actual amount of sales and profits made by Allied

during the boycott and post-boycott years, projected through 1986."

5. Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, provides, in pertinent part, that:

(a) It shall be unlawful, for the purpose of this section only ... for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason or [sic] any violation of subsection (a) of this section may sue therefor in any district court of the United States ... and shall recover the damages by him sustained and the cost of the suit.

to take reasonable steps to hold down its losses. *Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 598 F.2d 930, 933 (5th Cir.1979).

■ Whether or not damages in a § 303 action have been kept to a respectable minimum is a classic question of fact. *International Longshoremen's & Warehousemen's Union v. Hawaiian Pineapple Co.*, 226 F.2d 875, 880–81 (9th Cir.1955), *cert. denied*, 351 U.S. 963, 76 S.Ct. 1026, 100 L.Ed. 1483 (1956). Thus, a finding that a claimant acted reasonably to keep its damages low can be set aside on appeal only if clearly erroneous. *Marcoux v. Maine*, 797 F.2d 1100, 1106 (1st Cir.1986). Findings of fact will be sustained so long as they represent plausible interpretations of the record as a whole. *Id.*

■ In this case, the appellants have failed to persuade us that error was committed on this score. An entire series of minimization endeavors are abundantly documented. The appellee made prudent use of the port of Montreal as an alternative site for importation when feasible, made extensive inquiries to determine whether vessels carrying Russian cargo could be unloaded at various ports and at various times, exercised due diligence in checking port availability along the east and gulf coasts, and attempted in vain to gain assurances from Thomas Gleason, the ILA's president, that its cargos could be unloaded. It comes with an aura of ill grace that the union, which did its level best to obstruct the plaintiff's efforts to bring in Russian wood products, now protests that the plaintiff is somehow to be faulted because it was not ingenious enough to elude the reach of the union's boycott.

The ILA also argues that its boycott was "porous," meaning that several southern Ports began handling Russian cargos before the boycott officially ended. In the appellants' view, the plaintiff had a duty continuously to monitor the goods actually entering each port, and then to arrange for shipment to a place where Russian cargo might be welcomed. That view is myopic, to say the least. As the district judge found, information about the reopening of certain ports was not generally known at the times in question. 123 L.R.R.M. at 2457. When reopenings transpired, they were sporadic and somewhat vagarious. *Id.* The plaintiff was only under a duty to take reasonable steps to palliate damages, not to use supernormal efforts or to take extraordinary financial risks. Since preparations for a shipment of Russian cargo required months of lead time and costly advance commitments, it would have been impractical to launch a shipment on the gamble that, despite the ILA's pronouncements of a continuing boycott, the shipment could perhaps be unloaded weeks later when it reached a southern port.

■ The appellee was not under any duty to take outlandish chances in order to mitigate its damages. *See R.E.B., Inc. v. Ralston Purina Co.*, 525 F.2d 749, 755–56 (10th Cir.1975). A labor organization cannot engage in an illegal secondary boycott, announce that the boycott persists, and expect the injured party nonetheless to stand the hazard in the hope that the union's boasts are empty. We agree with the Fifth Circuit:

> The Union cannot have it both ways; it cannot engage in unlawful secondary activity designed to shut down an industrial operation and then claim that the plant should have been operated during the strike to minimize damages.

*Vulcan Materials*, 430 F.2d at 458.

### III.

The appellants argue that the district court's calculation of lost profits, relying in part on the testimony of APC's expert witness (Dr. Kendall), was erroneous as a matter of law. They view the Kendall evidence as an unmitigated disaster: faulty data, flawed assumptions, and the use of a discredited mathematical methodology.

■ It is axiomatic that the failure to object at trial, absent exceptional circumstances not present here, forecloses any opportunity to challenge the admissibility of the evidence on appeal. *See* Fed.R.Evid. 103(a)(1) ("Error may not be predicated

upon a ruling which admits ... evidence unless a substantial right of the party is affected, and ... a timely objection or motion to strike appears of record, ...."). *See also Morrow v. Greyhound Lines, Inc.*, 541 F.2d 713, 724 (8th Cir.1976); *Local 901, International Bhd. of Teamsters v. Compton*, 291 F.2d 793, 796–97 (1st Cir.1961). Our review of the nisi prius roll indicates that the defendants in no way preserved the testimonial objections which they now urge upon this court. Their failure so to do comprises a waiver of any right to raise such issues on appeal.

▮▮▮▮ Even if we were prepared to overlook this procedural default—and there is no readily apparent reason why we should—it would avail the union naught. A trial judge has wide discretion anent the admission and exclusion of expert testimony, and his decisions are to be sustained unless his discretion has been abused. *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *United States v. Wilson*, 798 F.2d 509, 517 (1st Cir.1986); *United States v. Fosher*, 590 F.2d 381, 382 (1st Cir.1979). We have scanned the transcript of Dr. Kendall's testimony, including opposing counsel's vigorous cross-examination of him, in sufficient detail to satisfy ourselves that the district court acted well within its proper province in admitting the interdicted testimony into evidence. It was likewise permissible for the judge, as the finder of the facts in this bench trial, to determine the weight and value to be accorded to Dr. Kendall's views. The appellants' contrary notion reflects a gross miscalculation on their part.

## IV.

We have considered all of the other assignments of error and find them to be meritless. Only one requires discussion. That last assertion is Local 799's contention that, irrespective of the ILA's culpability, it was error to hold the Local responsible for the full amount of the appellee's damages.

▮▮▮▮ Without a doubt, Local 799 participated in the boycott pursuant to the directive issued by the ILA. Clearly, its activities prevented the plaintiff from bringing Russian wood products into the port of Boston for some appreciable period of time. But, this tea party extended well beyond the Commonwealth. And, as an active participant in an illegal secondary boycott, Local 799 became jointly and severally liable with its international parent (the prime sponsor of the boycott) for *all* damages flowing from the unlawful scheme, wheresoever originating. It is no defense to the Local to say that it should only be held accountable for the damages related to the lawless closing of Boston's harbor to these imports.

▮▮▮▮ A violation of § 303 is a tort, in the nature of interference with advantageous economic relations. *See, e.g., Associated Imports, Inc. v. International Longshoremen's Ass'n*, 609 F.Supp. 595, 600 (S.D.N.Y.1985) (a secondary boycott "is an interference by one party with the contractual relations of two others.").[6] In point of fact, the appellants—by their assertion of a limitations defense premised on M.G.L. c. 260, § 2A, *see ante* Part I—have conceded as much. It is apodictic that joint tortfeasors are jointly and severally liable in a § 303 action. *Abreen Corp.*, 709 F.2d at 757; *International Union of Operating Engineers, Local 653 v. Bay City Erection Co.*, 300 F.2d 270, 271–72 (5th Cir.1962).

Local 799 was plainly acting in concert with the ILA. It associated itself with the outlawed activity as a willing participant. It was, in short, a joint tortfeasor. Local 799 thereby became liable for the entire amount of the boycott-related damages, even if the amount directly attributable to the Local's conduct was but a fraction of the whole. *Solomon v. Houston Corrugated Box Co.*, 526 F.2d 389, 392 n. 4 (5th

**6.** *Associated Imports* involved a fact situation virtually identical to that at bar. The plaintiff, an importer of Soviet glass products, brought a § 303 action against the ILA arising out of its refusal to unload goods during the 1980–81 boycott. The court analyzed the nature of a § 303 suit to determine the most analogous state law cause of action for the purpose of applying the appropriate statute of limitations, and settled upon tortious interference. *Associated Imports*, 609 F.Supp. at 599–600. *See also Park Electric Co. v. International Bhd. of Electrical Workers, Local 701*, 593 F.Supp. 1060, 1064 (N.D.Ill.1984) (similar).

Cir.1976); *see also Wainwright v. Kraftco Corp.*, 58 F.R.D. 9, 11–12 (N.D.Ga.1973); *cf. United States v. Baines*, 812 F.2d 41, (1st Cir.1987) ("[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight...."). Having elected to become an active player in a national boycott game, Local 799 cannot retreat into its small corner of New England when the score is tallied.

### V.

In fine, the record reflects that the district court did not abuse its discretion in allowing the complaint to be amended to name APC as the party plaintiff.[7] Thereafter, the ILA and Local 799 received a full and fair trial on the issue of damages. We find no substantial error in the course or conduct of that trial. The assignments of error lodged in these appeals are uniformly unavailing. The award of damages against the appellants, jointly and severally, is unimpugnable.

The judgment of the district court is *Affirmed.*

---

7. On March 31, 1986, after the trial on damages had been completed but before the district court had issued its rescript, APC Liquidating Trust was substituted for APC as the party plaintiff.

This further mutation is of no consequence to the disposition of the appeals, so we have ignored it.