Nancy MARCOUX, et al.,
Plaintiffs, Appellees,

v.

STATE OF MAINE, et al.,
Defendants, Appellants.

No. 85–1786.

United States Court of Appeals,
First Circuit.

Argued April 9, 1986.

Decided July 30, 1986.

Gail Ogilvie, Asst. Atty. Gen., Augusta, Me., for defendants, appellants.

Thomas B. Benjamin with whom Stephen P. Sunenblick and Sunenblick, Fontaine & Reben, Portland, Me., were on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, and COFFIN and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

In this sex-based wage discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1982), defendants-appellants the State of Maine, the Maine State Department of Personnel, and the Commissioner of the Maine State Department of Personnel appeal from a judgment entered in the United States District Court for the District of Maine in favor of plaintiffs-appellees Nancy Marcoux, Marcia Landers, Sandra Scarpelli, and a class of similarly situated female corrections officers employed by defendants at the Maine Correctional Center in South Windham, Maine. The district court's opinion is reported as *Marcoux v. State of Maine*, 35 Fair Empl. Prac.Cas. (BNA) 553 (D.Me.1984). We affirm.

## I.

The plaintiff class consists of female "Corrections Officers I" who work in Dormitory 4 at the Maine Correctional Center, South Windham, Maine ("MCC"). Plaintiffs claim that they perform work substantially equal to that performed by the guards at the Maine State Prison in Thomaston ("MSP"), who are predominantly

male,[1] yet receive less favorable retirement benefits under the Maine State Retirement System, Me.Rev.Stat.Ann. tit. 5, § 1121 (1979 & Supp.1985). Plaintiffs are assigned to guard, among others, female prisoners who, because of the seriousness of their crimes, have been officially sentenced to serve their time at MSP. Because the latter facility is operated solely for male inmates, however, females committed to MSP actually serve their sentences at MCC.[2]

Plaintiffs brought the present action on April 8, 1981, claiming that the disparity between their retirement benefits and the retirement benefits received by the mostly male guards at MSP constituted unlawful sex discrimination in violation of Title VII, 42 U.S.C. §§ 2000e et seq. (1982).[3] At a bench trial, defendants sought to justify the disparity on the ground that plaintiffs' retirement benefits are the same as those accorded all corrections officers, male as well as female, at MCC. Defendants also pointed out that the few female guards employed at MSP receive the same, superior retirement benefits provided for service at that facility. Accordingly, defendants argued, location, and not sex, explain the differential.

The district court rejected this justification. It found that the plaintiffs' duties in Dorm 4 at MCC required greater skill, and were more stressful, than the duties performed by other corrections officers at MCC. At the same time, it found that plaintiffs performed work substantially equal to that performed by the predominantly male guards at MSP. The district court concluded that the state had failed to prove, as an affirmative defense, that location rather than sex explained the disparity in retirement benefits, and entered judgment for plaintiffs on their Title VII claim. This appeal followed.

## II.

Defendants argue that the district court did not have jurisdiction over the plaintiff class claims because, at the time the class was certified, none of the named plaintiffs was a member of the certified class, and no member of the class other than the named plaintiffs had secured a right to sue letter from the EEOC. See 42 U.S.C. §§ 2000e–5(b), (e) & (f) (1982). We find no merit in this argument.

■ The parties' proposed class certification order, approved by the court on July 5, 1983, defined the plaintiff class as,

all female Corrections Officers I employed by defendants at the Maine Correctional Center, Windham, Maine, and assigned to guard female inmates sentenced to the Maine State Prison, from June 12, 1978, to the present, and all female Corrections Officers I who will in the future be assigned to guard female inmates sentenced to the Maine State Prison.

By the time the order was approved, Nancy Marcoux and Sandra Scarpelli had both

1. At the time of trial, MSP employed approximately 140 guards, only four of whom were women. *Marcoux*, 35 Fair Empl.Prac.Cas. (BNA) at 555. All the MSP guards, male and female, were entitled to the same retirement benefits. While MSP retirement benefits are superior to those at MCC, there is no differential in the wages paid at the two institutions.

2. Prior to January 16, 1984, persons convicted of murder or sentenced to terms of more than five years' imprisonment in Maine were sentenced to serve their time at MSP. Me.Rev.Stat. Ann. tit. 17–A, §§ 1251–52 (1983). Effective January 16, 1984, unless they are to be imprisoned in a county jail, all persons are sentenced to the Maine Department of Corrections, not to a particular state correctional facility, irrespec-

tive of the crime they committed or the length of sentence imposed. Me.Rev.Stat.Ann. tit. 17–A, §§ 1251–52 (1983 & Supp.1985). The district court found that "this change of law will not affect in any substantial degree the current practice of committing dangerous male prisoners to the MSP ... nor ... the current practice of committing female prisoners to the MCC." *Marcoux*, 35 Fair Empl.Prac.Cas. (BNA) at 555. Defendants do not challenge this finding on appeal.

3. The district court did not address plaintiffs' claim under 42 U.S.C. § 1983 (1982), and the parties do not discuss this claim on appeal. Accordingly, our review is confined to plaintiffs' Title VII claim.

been promoted to the position of Corrections Officer II, Marcoux on March 14, 1977 and Scarpelli on August 23, 1981, while Marsha Landers had resigned on March 29, 1980. But we read the class definition as including anyone who, on or after June 12, 1978, was employed as a female Corrections Officer I assigned to guard female inmates sentenced to MSP even if they were promoted, or resigned, prior to the date of the certification order. Both Scarpelli and Landers were, therefore, class members.

We add that even after they were no longer Corrections Officers I, Scarpelli and Landers maintained a concrete interest in the outcome of the dispute. Under the Maine State Retirement System, once an eligible employee engages in work covered under the preferential retirement system, the employee is credited with years of preferential service. *See* Me.Rev.Stat.Ann. tit. 5, §§ 1001(7) & 1094 (1979 & Supp.1985). These credits vest with the employee and may be used to compute preferential retirement benefits "cumulatively in any combination of such prison employment." Me. Rev.Stat.Ann. tit. 5, § 1121(4)(F) (Supp. 1985). Thus, even resigned employees like Marsha Landers remain able to take advantage of credited years of preferential service at some future date, and were affected, as to the amounts involved, by this case.

■■■ Being class members with an ongoing stake in the case, Sandra Scarpelli and Marsha Landers were capable of adequately representing the class. *See East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977). Plaintiffs concede that because Nancy Marcoux was promoted before June 12, 1978, she does not fall within the class definition. They argue, however, that she should be permitted to participate in the judgment because she was inadvertently omitted from the class, actively pursued her claim on behalf of the class, and participated at trial. Under Fed. R..Civ.P. 23(c)(1), a class certification order "may be conditional, and may be altered or amended before the decision on the merits." Plaintiffs did not move below to amend the class certification order to include Nancy Marcoux prior to judgment, and we do not believe it is within the province of this court to amend the class certification order on appeal. Our refusal to act is without prejudice to any right plaintiffs may still have to petition the district court for Marcoux's inclusion.

### III.

■■ Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... sex...." 42 U.S.C. § 2000e-2(a) (1982). However, in 42 U.S.C. § 2000e-2(h) (1982), the so-called "Bennett Amendment" to Title VII, Congress provided that,

> It shall not be an unlawful employment practice ... for any employer to differentiate upon the basis of sex in determining the amount of wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the [Equal Pay Act] provisions of section 206(d) of Title 29.[4]

In an action brought under the Equal Pay Act provisions of 29 U.S.C. § 206(d) (1982), the plaintiff must show that she was employed in the same establishment as her male counterpart in order to state a claim.

---

**4.** Section 206(d)(1) (1982) provides,

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

*See, e.g., Foster v. Arcata Associates, Inc.,* 772 F.2d 1453, 1464–65 (9th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986). Defendants contend that as a result of the Bennett Amendment, the single establishment requirement of the Equal Pay Act has become a necessary element in equal pay claims brought under Title VII. They insist the single establishment requirement bars the present Title VII claims by female corrections officers since the latter serve at an institution different from the one whose higher benefits they seek to share.

We do not accept this argument. In *County of Washington v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), respondents, four women prison guards who were employed by the petitioner County to guard female prisoners, brought a Title VII action against the County alleging, *inter alia,* that they were paid lower wages than that received by male guards, and that part of the pay differential was attributable to intentional sex discrimination. Respondents argued that a Title VII plaintiff did not have to satisfy the "equal work" standard of the Equal Pay Act, in order to maintain an action for equal pay under Title VII.

The Supreme Court agreed. The Court held that "only differentials attributable to the four affirmative defenses of the Equal Pay Act are 'authorized' by that Act within the meaning of [the Bennett Amendment]," *Gunther,* 452 U.S. at 171, 101 S.Ct. at 2249, reasoning in part,

> Under petitioners' reading of the Bennett Amendment, only those sex-based wage discrimination claims that satisfy the "equal work" standard of the Equal Pay Act could be brought under Title VII. In practical terms, this means that a woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be—unless her employer also employed a man in an equal job in the same establishment, at a higher rate of pay. Thus, if an employer hired a woman for a unique position in the company and then admitted that her salary would have been higher had she been male, the woman would be unable to obtain legal redress under petitioners' interpretation. Similarly, if an employer used a transparently sex-biased system for wage determination, women holding jobs not equal to those held by men would be denied the right to prove that the system is a pretext for discrimination. Moreover, to cite an example from a recent case, *Los Angeles Dept. of Water & Power v. Manhart,* 435 U.S. 702 [98 S.Ct. 1370, 55 L.Ed.2d 657] (1978), if the employer required its female workers to pay more into its pension program than male workers were required to pay, the only women who could bring a Title VII action under petitioners' interpretation would be those who could establish that a man performed equal work: a female auditor thus might have a cause of action while a female secretary might not. Congress surely did not intend the Bennett Amendment to insulate such blatantly discriminatory practices from judicial redress under Title VII.

*Id.* at 178–79, 101 S.Ct. at 2252 (footnote omitted).

We think defendants' single establishment argument fails for the same reasons that petitioners' equal work argument failed in *Gunther.* Under defendants' reasoning, a single employer could engage in intentional sex discrimination so long as male and female workers who performed identical jobs worked in different "establishments." As the Ninth Circuit has held, such a result "is contrary to the rationale of *Gunther* and the Supreme Court's pronouncement that courts must 'avoid interpretations of Title VII that deprive victims of discrimination of a remedy, without clear congressional mandate.'" *Bartelt v. Berlitz School of Languages of America, Inc.,* 698 F.2d 1003, 1006 (9th Cir.) (*quoting Gunther,* 452 U.S. at 178, 101 S.Ct. at 2252), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). Plaintiffs did not have to satisfy the single establishment requirement of the Equal Pay Act provided they made out a valid case under Title VII.

## IV.

This brings us to a more difficult issue not raised by either party: whether the district court erred in substituting for the conventional Title VII burdens of proof and persuasion the Equal Pay Act analysis adopted by the Ninth Circuit in *Kouba v. Allstate Insurance Co.*, 691 F.2d 873, 875 (1982). *See also Odomes v. NuCare, Inc.*, 653 F.2d 246, 250–51 (6th Cir.1981); *Melanson v. Rantoul*, 536 F.Supp. 271, 286 (D.R. I.1982).

In an ordinary Title VII case, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff ... 'remains at all times with the plaintiff.'" *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984). In *Kouba*, however, the Ninth Circuit held that, in Title VII cases of the present character, the four defenses listed in 29 U.S.C. § 206(d)(1) (1982) and incorporated into Title VII through the Bennett Amendment, 42 U.S.C. § 2000e–2(h) (1982), are *affirmative defenses* on which the employer has the burden of proof, largely removing, it seems, plaintiff's Title VII burden of proving overt discriminatory intent. Citing to *Kouba*, the district court here did not indicate that plaintiffs had any burden of establishing intentional discrimination, but rather treated the case as if it were an Equal Pay Act case, albeit one not limited by the single establishment requirement.

Once the district court had determined that the plaintiffs had made out a prima facie case of sex discrimination by showing they received less favorable benefits at MCC for work substantially equal to that performed by guards at MSP, the court placed the burden on *defendants* to prove their proffered non-discriminatory reason for the differential, *i.e.*, that the differential was not based on sex, but on the fact that MCC and MSP were different institutions where everyone, male and female, *in the same institution* was treated identically. The court then proceeded to find that plaintiffs' jobs at MCC were more difficult and stressful than those of the other corrections officers at MCC. It concluded that defendants had failed to prove affirmatively that the lower retirement benefits were due to "job classification and job location," and, without more, concluded that Title VII had been violated. The court made no explicit findings that defendants had engaged in intentional discrimination. *Marcoux*, 35 Fair Empl.Prac.Cas. (BNA) at 565.

When the district court decided this case, this circuit had not had occasion to consider whether or not to adopt the *Kouba* analysis, nor have we since faced that question. *Kouba* has been severely criticized by the United States District Court for the Northern District of Illinois in *EEOC v. Sears, Roebuck & Co.*, 628 F.Supp. 1264, 1328–32 (N.D.Ill.1986). The *Sears* court believed that *Kouba* and similar cases went well beyond the Supreme Court's opinion in *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), in assuming that the latter held or implied "that the Equal Pay Act analysis governs Title VII claims of unequal pay for substantially equal work." *EEOC v. Sears, Roebuck & Co.*, 628 F.Supp. at 1329. The *Sears, Roebuck* court doubted that the Bennett Amendment, designed to preserve certain defenses for employers, could possibly be read to relieve *plaintiffs* of their usual Title VII burden.

But while the *Kouba* analysis raises questions, and while the placing of the burden of persuasion could well affect the outcome of a close case like the present one, we decline to pass on whether the lower court erred in applying the *Kouba* analysis here. Defendants nowhere objected to the lower court's use of the *Kouba* analysis. They have, to be sure, argued that the single establishment requirement of the Equal Pay Act is a prerequisite to recovery under Title VII, *see* discussion Part III, *supra*, but this is entirely different from arguing that the Bennett Amendment does not relieve a Title VII plaintiff from the usual burdens of proof and persuasion in a Title VII case—in particular,

from the burden to prove intentional discrimination.

■ The fact is, defendants have accepted, or at least not objected to, the analysis employed by the district court following *Kouba.* While we specifically refrain from deciding that this is a correct analysis, we cannot say that its unobjected to use by the district judge constituted "plain error," for it was based on significant circuit and district court authority. *See EEOC v. Sears, Roebuck & Co.,* 628 F.Supp. at 1328 n. 85 (collecting cases). *But see Plemer v. Parsons-Gilbane,* 713 F.2d 1127, 1136 (5th Cir. 1983). Because we do not normally review issues not raised before the district court, much less arguments not presented on appeal, it would be inappropriate at this juncture to determine whether or not the lower court's analysis was correct. Instead, we shall assume, as do the parties, that the analytical framework employed by the district court was a sufficient one for purposes of this case. In so doing we make it clear that we do not mean to pass generally on the correctness of that mode of analysis.

### V.

■ Applying the court's Equal Pay Act framework, defendants argue that plaintiffs failed to establish a prima facie case of sex discrimination and, in the alternative, that plaintiffs' claim of sex discrimination was effectively rebutted by defendants' showing that the differential in retirement benefits was based on a factor other than sex, *i.e.,* that plaintiffs are employed at MCC instead of MSP. In reviewing the district court's findings, we employ the "clearly erroneous" standard of review embodied in Fed.R.Civ.P. 52(a). *Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64, 71 (1st Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984). Our role under that standard is carefully circumscribed:

> This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under

Rule 52 if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo." Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

*Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). We must sustain the district court's findings if they represent a plausible interpretation of the record as a whole.

### A. *Prima Facie Case*

The district court based its conclusion that plaintiffs had established a prima facie case upon findings that plaintiffs performed work requiring substantially equal levels of skill, effort, and responsibility as work performed by guards at MSP, and that plaintiffs and MSP guards labored under substantially equal working conditions. These criteria are contained in the Equal Pay Act, 29 U.S.C. § 206(d)(1) (1982) (quoted *supra* note 4), and have sometimes been used to evaluate claims of sex-based wage discrimination brought under Title VII. *See Morgado v. Birmingham-Jefferson County Civil Defense Corps,* 706 F.2d 1184, 1187–88 (11th Cir.1983), *cert. denied,* 464 U.S. 1045, 104 S.Ct. 715, 79 L.Ed.2d 178 (1984); *cf. Plemer v. Parsons-Gilbane,* 713 F.2d 1127, 1137 (5th Cir.1983) (prima facie compensation case under Equal Pay Act sufficed to make out prima facie case under Title VII). The present applicability of these criteria is not challenged by defendants.

It is undisputed that plaintiffs receive lower retirement benefits than guards at MSP, but defendants argue that plaintiffs

failed to establish a prima facie case of sex discrimination because plaintiffs do not perform work substantially equal to that performed by MSP guards. We deal in turn with defendants' principal arguments in this regard:

1. Defendants argue that the evidence introduced at trial shows that it is female inmates sentenced for shorter prison terms to MCC, and not the female inmates sentenced to MSP, who pose the greatest problems and risks to female Corrections Officers I in Dorm 4. But, assuming for present purposes only that the Equal Pay Act analytical framework employed by the district court was correct, we cannot say that this demonstrates clear error in the court's finding that plaintiffs had established a prima facie case.

■■■ To be sure, an important element of plaintiffs' case is that they guard female inmates comparable to the male inmates incarcerated in MSP. But it does not follow that plaintiffs must also establish that it is the female inmates sentenced to MSP, and not other inmates in Dorm 4, who cause the work to be substantially equal in stress, and in the skill and vigilance required, to that performed by male guards at MSP.[5] A female plaintiff does not have to show that her job is perfectly congruent with that of her male counterpart in order to succeed on a claim of sex-based wage discrimination under Title VII. *Gunther*, 452 U.S. at 178–80, 101 S.Ct. at 2252–53.

2. Defendants contend that the working conditions in Dorm 4 at MCC and at MSP are not substantially equal, because female corrections officers in Dorm 4 at MCC escort prisoners to meals, Dorm 4 has its own self-contained segregation unit so that prisoners who are causing disturbances do not have to be moved outside of the building, and the cell doors of inmates who have exhibited good behavior in Dorm 4 are left open at night. In contrast, MSP guards do not escort prisoners to meals, no dorm at MSP has a self-contained segregation unit, and all the cells at MSP are locked at night. In our view, these distinctions do not undercut plaintiffs' claim, but buttress the district court's conclusion that "the working conditions for Dorm 4 officers are at least as stressful and hazardous as those for prison guards at the MSP." *Marcoux* 35 Fair Empl.Prac.Cas. (BNA) at 564.

■■■ The fact that female corrections officers in Dorm 4 have to escort prisoners to meals increases rather than decreases their direct exposure to the prison population. The district court found that one of the factors that contributed to the stress of working in Dorm 4 was "the essentially constant contact of the [corrections] officer with inmates for two of the three shifts— and all three shifts on weekends." *Id.* at 599. The cell doors in Dorm 4 are left unlocked at night not because the corrections officers want to leave them unlocked, but because of a fire marshal's report which prohibited the night officer on duty from locking more than ten cell doors. *Id.* at 557, 559. Finally, the district court found that the fact that Dorm 4 has its own segregation unit contributes to rather than diminishes the stress of the work environment, because corrections officers are unable "to remove completely from the dorm an inmate who is 'acting out.'" *Id.* at 559. Because we cannot say that any of these findings are clearly erroneous, we sustain, under the theory upon which this case was tried, the district court's finding that the working conditions of female Corrections Officers I in Dorm 4 at MCC and guards at MSP are substantially equal.

■■■ 3. Defendants argue that the district court erred in concluding that plaintiffs established a prima facie case, because plaintiffs presented no evidence concerning the working conditions or duties of four class members who were assigned to

---

**5.** The positions of female Corrections Officers I in Dorm 4 at MCC and guard at MSP "[b]oth involve the supervision, observation, and disciplining of persons convicted of crimes and incarcerated by the state." *Marcoux,* 35 Fair Empl.Prac.Cas. (BNA) at 563. Thus, this case does not involve the controversial concept of comparable worth. *See, e.g., American Nurses' Association v. Illinois,* 783 F.2d 716, 718–20 (7th Cir.1986).

work at the Oakhaven Pre-Release Center with female inmates sentenced to MSP. However, the district court's opinion and judgment both indicate that the conditions at Oakhaven were collateral to the issues in the litigation. In its opinion, the district court expressly stated that Oakhaven was not a part of the lawsuit. *Marcoux*, 35 Fair Empl.Prac.Cas. (BNA) at 557 n. 4 ("[I]n view of the scope of the evidence presented at trial by *both* sides, ... all concerned, including the Court, understood that the issues [in the litigation] were confined to the female officers in Dorm 4."). Moreover, the district court's judgment for plaintiffs did not extend to female Corrections Officers I assigned to Oakhaven, but only to those "who predominantly guard female inmates in Dormitory 4 or in any housing facility which replaces Dormitory 4 at the Maine Correctional Center." Thus, we see no error on this score.

### B. *Factor Other Than Sex*

Pay differentiation between the sexes is authorized under the Equal Pay Act, and likewise under Title VII, if "based on any other factor other than sex." 29 U.S.C. § 206(d)(1)(iv) (1982); *see* 42 U.S.C. § 2000e–2(h) (1982); *Gunther*, 452 U.S. at 169–71, 101 S.Ct. at 2247–49. Pointing to the fact that males and females in each institution were treated alike, defendants maintain that location, not sex, was the true reason for the disparity in benefits between MCC and MSP.

The district court thought it a matter of affirmative defense for defendants to establish that the disparity in benefits between female guards in Dorm 4, MCC, and the mostly male guards at MSP, was based on a factor other than sex. The court held that defendants had failed to prove this defense, because they did not sustain their burden of showing "that the male corrections officers at the MCC perform work equal to that performed by the female corrections officers; that they exercise sub-

stantially the same skill, effort, and responsibility; and that they do so under similar working conditions." *Marcoux*, 35 Fair Empl.Prac.Cas. (BNA) at 564.[6] The district court found that, although the work performed by, and skill and effort required of, male and female corrections officers at MCC were substantially equal, the female corrections officers were required to exercise greater degrees of responsibility or accountability than their male counterparts, and the working conditions in Dorm 4 at MCC were substantially more stress-filled and hazardous than nearly all of the other assignments for corrections officers at MCC. *Id.*

Defendants argue that the district court committed clear error in finding that female corrections officers are required to exercise greater degrees of responsibility or accountability than their male counterparts, and that the working conditions in Dorm 4 are more stress filled and hazardous than nearly all of the other assignments for corrections officers at MCC. In addition, defendants emphasize in their brief that all female Corrections Officers I at MCC receive the same retirement benefits as male Corrections Officers I at MCC and, implicitly, that there is nothing to prevent plaintiffs from seeking employment as guards at MSP where women as well as men receive higher retirement benefits.

■ We have reviewed the record and cannot say the district court's findings are clearly erroneous. There is evidence in the record to support the district court's findings that, in contrast to other corrections officers at MCC, female corrections officers on duty in Dorm 4 (1) must exercise considerably more discretion and innovation in their contacts with inmates; (2) are in contact with inmates for many more hours; (3) have fewer official options in disciplining or rewarding inmates; (4) deal with a significantly higher percentage of inmates who are serving sentences of more

---

**6.** As defendants acquiesce in the district court's view that this was an affirmative defense on which they had the burden of proof, we do not consider to what extent this is so in a Title VII case, and whether the defenses enumerated in 29 U.S.C. § 206(d)(1) (1982) can shift the ultimate burden of persuasion to the defendant in such a case. *See* discussion Part IV *supra*.

than five years; (5) face a higher rate of inmate confrontations in a close-quartered environment that breeds hostility and restlessness; and (6) work with inmates who have access to objects, not accessible in any other housing area at MCC, which can be used as lethal weapons. *Marcoux*, 35 Fair Empl.Prac.Cas. (BNA) at 564–65.

Because we cannot say that the district court clearly erred in concluding that the positions of female Corrections Officer I in Dorm 4 at MCC and male prison guard at MSP are substantially equal, and that the work performed by female Corrections Officers I is more demanding than that of their male counterparts at MCC, the fact that female and male Corrections Officers I at MCC receive the same retirement benefits did not compel a finding by the district court that plaintiffs' prima facie case was rebutted, assuming, as did the court below, and the parties, that the more mechanical analytical framework of the Equal Pay Act applies. We do not deem it dispositive that a tiny fraction of the guards at MSP are females. Most of the MSP guards are male, and, like them, the female Corrections Officers I in Dorm 4 at MCC guard inmates who have been convicted of murder or sentenced to more than five years in prison. Me.Rev.Stat.Ann. tit. 17–A, §§ 1251–52 (1983 & Supp.1985). As indicated above, we leave for another day our ruling on the correctness of the analytical framework accepted by the district court and the parties. Accepting that framework, and applying the clearly erroneous standard, we must affirm the judgment below.

*Affirmed.*