**Dr. Marjorie McMILLAN,**

v.

**MASSACHUSETTS SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS; Dr. Gus Thornton; and Dr. Paul Gambardella.**

Civ. A. No. 92–11178–RGS.

United States District Court,
D. Massachusetts.

March 17, 1995.

Melissa Bayer Tearney, Beth O. Maloney, Marcus E. Cohen, Peabody & Brown, Dahlia C. Rudavsky, Ilyse Levine, Messing & Rudavsky, P.C., Boston, MA, for McMillan.

Susan L. Lennox, Marcus E. Cohen, Peabody & Brown, Boston, MA, for Massachusetts Soc. for the Prevention of Cruelty to Animals, Dr. Gus Thornton, Dr. Paul Gambardella.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

The plaintiff, Dr. Marjorie McMillan, a veterinary radiologist, brought this lawsuit against her employer, the defendant Massachusetts Society for the Prevention of Cruelty to Animals (MSPCA), and two of her supervisors, Dr. Gus Thornton, and Dr. Paul Gambardella. McMillan was employed as the Head of the Radiology Department at Angell Memorial Animal Hospital (Angell), an institution owned and operated by the MSPCA. McMillan alleges that during seven of her ten years at Angell, she was discriminated against on the basis of her gender in that she was paid less than her male counterparts in violation of Title VII of the Civil Rights Act of 1964, the Federal Equal Pay Act (29 U.S.C. § 206(d)), G.L. c. 151B, and G.L. c. 93 § 102.[1] She also alleges that she was fired in retaliation for pursuing her pay discrimination claim, and that her dismissal constituted a breach of contract and a negligent breach of her employer's contractual duty of care. Finally, she alleges tortious interference with advantageous relations by Gambardella and Thornton. Before the court is defendants' motion for summary judgment.

### FACTS

The facts, viewed in the light most favorable to the plaintiff, are as follows. McMil-

---

1. The parties agree that the claim under G.L. c. 93 § 102 is no longer viable in light of *Charland v. Muzi Motors, Inc.*, 417 Mass. 580, 631 N.E.2d 555 (1994).

lan began her career as Director of Radiology at Angell in 1981. She worked continuously until December of 1983, when she took a leave of absence lasting through 1985. Angell maintains some twenty veterinarians on staff who provide direct care as well as instructional guidance to interns and postgraduate residents. Until 1988, Angell was divided into seven departments: Clinics, Cardiology, Intensive Care Unit, Radiology, Medicine, Surgery, and Pathology. Each department was headed by a "Director." In 1988, Clinics, Cardiology, and Intensive Care were merged into the Department of Medicine. The title of Department Director was changed to Department Head. McMillan's salary complaint dates from her return as Director of Radiology in 1985 (she does not claim to have been underpaid prior to that time). During McMillan's employment, Thornton, Gambardella, and two other male veterinarians made occasional comments that could have been construed as sexist.

Until 1989, Thornton served as Angell's Chief of Staff. In that position, he was responsible for setting salary levels for new employees and determining annual increases. In 1989, Thornton became President of the MSPCA and Gambardella became Chief of Staff. Gambardella designed and implemented a salary system which assigned a grade to every veterinarian and awarded annual increases in pay based on performance evaluations and ranges within each grade. In the year following the implementation of this new pay system, McMillan's salary jumped from $58,295 to $72,000. Notwithstanding this increase, it is undisputed that from 1985 until the termination of her employment on November 26, 1991, McMillan was paid less than any other Director/Department Head, while her job description was for all practical purposes indistinguishable from that of her male colleagues.

McMillan first discovered the pay disparity in August of 1989. She filed a gender discrimination claim with the MCAD in October of 1989. In January of 1990, McMillan entered into negotiations with Angell over the purchase of Windhover, a private aviary practice established by McMillan in Walpole, Massachusetts. McMillan sought either (1)

to rent space at Angell to carry on the practice; (2) to sell the practice to Angell; or (3) to be paid separately for treating birds at Angell. The negotiations came to an impasse, and McMillan refused to treat birds any longer at Angell. (McMillan had been spending approximately six hours each week on aviary work.) On November 26, 1991, McMillan was fired without notice or warning. Within fifteen minutes of her termination, she was ordered to leave the premises. She was forbidden to re-enter Angell or to speak to staff who were on duty. The firing occurred two years after McMillan filed her MCAD complaint. McMillan had no written employment contract, but in March of 1990, the MSPCA distributed a Rules and Regulations Memorandum which McMillan contends has contractual significance.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact, and [where] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Gaskell v. Harvard Cooperative Society,* 3 F.3d 495, 497 (1st Cir.1993). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990). "As to issues on which the nonmovant has the burden of proof, the movant need do no more than aver 'an absence of evidence to support the nonmoving party's case.' The burden of production then shifts to the nonmovant, who, to avoid summary judgment, must establish the existence of at least one question of fact that is both 'genuine' and 'material.'" *In re Varrasso,* 37 F.3d 760, 763 n. 1 (1st Cir.1994) (citations omitted). "In this context, 'genuine' means that the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Rodriguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 38 (1st Cir.1993). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations

omitted). A genuine fact is considered material only when it has the "potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993). All reasonable inferences must be indulged in favor of the non-moving party when assessing whether disputed issues of fact are sufficient to block summary judgment, *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988), but "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

## *EMPLOYMENT DISCRIMINATION AND EQUAL PAY ANALYSES*

■■■ To establish a Title VII prima facie case of discrimination based upon gender, a plaintiff must show: (1) that she is a member of a protected class; (2) that she met legitimate job performance expectations; (3) that she experienced an adverse employment action; and (4) that the employer sought a replacement of equal skill for the position. See *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir.1994); *Brunner v. Stone & Webster Engineering Corp.*, 413 Mass. 698, 700, 603 N.E.2d 206 (1992). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court adopted a burden shifting analysis to be used in evaluating Title VII employment discrimination claims. Under the Supreme Court's formula, once a plaintiff has established a prima facie case of discrimination, a presumption of discrimina-

tion arises. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's termination. *McDonnell Douglas, supra* at 802, 93 S.Ct. at 1824; *Burdine, supra* at 253–255, 101 S.Ct. at 1093–95. If the employer produces evidence that an adverse employment action was taken for a legitimate reason, the *McDonnell–Burdine* presumption is rebutted and disappears from the case. *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The burden of production then shifts back to the plaintiff, who must "introduce sufficient evidence to support two additional findings: (1) that the employer's articulated reason for the job action is a pretext, and (2) that the true reason is discriminatory. The plaintiff may rely on the same evidence to prove both pretext and discrimination, but the evidence must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by discriminatory animus." *Smith v. Stratus Computer, Inc., supra* at 16 (citations omitted).[2] The *McDonnell–Burdine* framework addresses only the formal allocation of the burdens of production; the "ultimate burden of persuasion" remains at all times with the plaintiff. *St. Mary's, supra* at ——, 113 S.Ct. at 2749; *Blare v. Husky Injection Molding Systems, Boston, Inc.*, 419 Mass. 437, 445, 646 N.E.2d 111 (1995).

■■■ To establish a prima facie case under the Equal Pay Act, a plaintiff must show that: (1) her employer is subject to the Act; (2) that discrimination regarding wages occurred within the same working establishment; (3) that she performed work in a position requiring equal skill, effort and responsibility under similar working conditions; and (4) that she was paid less than a comparable employee of the opposite sex. The plaintiff is not required to show that the

---

**2.** Although the Massachusetts courts generally apply federal case law when considering employment discrimination claims brought under G.L. c. 151B, see *Wheatley v. American Telephone & Telegraph Co.*, 418 Mass. 394, 397, 636 N.E.2d 265 (1994), the Supreme Judicial Court recently departed from this rule. In *Blare v. Husky Injection Molding Systems Boston, Inc.*, 419 Mass. 437, 444–445, 646 N.E.2d 111 (1995), the Court held that "once a plaintiff has established a prima facia case and further shows that the employ-

er's articulated reasons are a pretext ... the plaintiff is entitled to recovery for illegal discrimination." This approach, expounded by Justice Souter in his dissenting opinion in *St. Mary's Honor Center v. Hicks*, —— U.S. ——, —————, 113 S.Ct. 2742, 2756–2766, 125 L.Ed.2d 407 (1993), will allow some claims of discrimination under 151B to reach a jury that would not survive summary judgment if brought under Title VII.

compared jobs are identical, only that they are "substantially equal." See *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). Once a prima facie case is made out under the Equal Pay Act, the employer must resort to the Act's statutory defenses, that is, that pay differentials can be explained by seniority, merit, quantity or quality of production, or by "any other factor other than sex." *Id.* at 191, 94 S.Ct. at 2226. In Equal Pay Act cases, the *McDonnell–Burdine* burden shifting framework does not apply, as the plaintiff need not show that the defendant was motivated by a discriminatory animus.

■■■ The affirmative defenses of the Equal Pay Act were incorporated by Congress into Title VII by way of the so-called Bennett Amendment. The Amendment is intended to prevent plaintiffs from using Title VII to circumvent the Equal Pay Act when the pay difference at issue can be justified by one or more of the Equal Pay Acts' affirmative defenses. However, as construed by the Supreme Court in *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), the Amendment does not confine Title VII sex-based wage discrimination claims to the four corners of the Equal Pay Act. The Court's concern was with the "equal work" requirement of the Act. If strictly applied in the Title VII context, "this [requirement would mean] that a woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be—unless her employer also employed a man in an equal job in the same establishment, at a higher rate of pay." *Id.* at 178, 101 S.Ct. at 2252. In response to the argument raised by Washington County that such an interpretation would render the Bennett Amendment superfluous, the Court explained that its reasoning still permitted Title VII defendants an affirmative defense that would otherwise only be available in Equal Pay Act cases:

> [I]mportantly, incorporation of the fourth affirmative defense could have significant

consequences for Title VII litigation. Title VII's prohibition of discriminatory employment practices was intended to be broadly inclusive, proscribing "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." The structure of Title VII litigation, including presumptions, burdens of proof, and defenses, has been designed to reflect this approach. The fourth affirmative defense of the Equal Pay Act, however, was designed differently, to confine the application of the Act to wage differentials attributable to sex discrimination. Equal Pay Act litigation, therefore, has been structured to permit employers to defend against charges of discrimination where their pay differentials are based on a bona fide use of 'other facts other than sex.'

*Gunther, supra* at 170, 101 S.Ct. at 2248 (citations omitted).

■■■ Although the *Gunther* Court declined to decide "how sex-based wage discrimination litigation under Title VII should be structured to accommodate the fourth affirmative defense of the Equal Pay Act," *id.* at 171, 101 S.Ct. at 2249, it seems unlikely that the Court, if it meant what it said about augmenting an employer's ability to defend against a Title VII wage discrimination claim, intended that the burden of persuasion be shifted to the employer upon the establishment of a Title VII prima facie case. It would seem still incumbent on a plaintiff in a Title VII case to produce some evidence that the employer's articulated "other than sex" defense is a gender subterfuge before such a shift occurs. Thus, a plaintiff who brings an equal pay claim under Title VII finds her task easier in one respect (no "equal work" requirement), but harder in another (burden shifting applies to the basic elements of the Title VII claim).[3] Cf. *Marcoux v. State of Maine*, 797 F.2d 1100, 1105 (1st Cir.1986) (declining to decide whether "the district court erred in substituting for the conventional Title VII burdens of proof and persuasion the Equal Pay Act analysis"). Compare *Denny v. Westfield State College*, 669

---

**3.** Only after the plaintiff has made a showing in satisfaction of the *McDonnell–Burdine* burden shifting framework does the burden of persuasion shift to a Title VII defendant who seeks to

invoke a Bennett Amendment affirmative defense. See *Kouba v. Allstate Insurance Co.*, 691 F.2d 873, 875 (9th Cir.1982).

F.Supp. 1146, 1156 (D.Mass.1987).[4] Simply stated, the difference between the two statutes is that the Equal Pay Act requires a plaintiff to prove that "I was paid less than a comparable man *and* I am a woman," while Title VII requires a plaintiff to prove, even in the absence of a comparable man, that "I was paid less than I deserved *because* I am a woman."

## DISCUSSION

### I. EQUAL PAY

■ The MSPCA argues that · because McMillan as Director/Department Head of Radiology did not have the same supervisory, budgetary, or administrative responsibilities as did other Directors/Department Heads (that is, her job was not "substantially equivalent"), she cannot establish a prima facie case under the Equal Pay Act. Thornton and Gambardella also deny that gender formed the basis of any of their salary decisions. They justify the significant salary differential between McMillan and the others [5] by asserting that her job was less time consuming, produced less revenue for the MSPCA, and involved fewer functions. Specifically, they point to the fact that Radiology had the smallest staff and no actual responsibility for interns or residents.

These explanations, if believed by a jury, would permit the MSPCA to prevail at trial. However, as the record stands, the MSPCA's internal job descriptions do not define the nature and scope of McMillan's responsibilities in any fashion materially different from those of her peers. Moreover, the objective criteria on which the MSPCA claims to have based its salary decisions are in dispute. McMillan's claim that she had significant teaching duties, for example, is corroborated by the deposition testimony of Michael Aronsohn, a staff surgeon at Angell from 1981 through 1988 and the Head of Surgery from 1988 through 1994, and by paragraph 11 of the "Responsibilities" section of McMillan's job description. ("Actively participate in the training of interns and residents throughout the hospital.") Similarly, Thornton's deposition testimony indicates that he did not consider revenue generation in setting salaries for the heads of the radiology and pathology departments, despite the fact that the MSPCA points to the anemic earnings of McMillan's department as evidence that she was not worthy of a similar level of compensation. Because a material dispute of fact exists concerning the comparability of McMillan's position with that of other department heads, the defendant's motion for summary judgment must be denied with respect to a claim of a violation of the Equal Pay Act.[6]

4. In *Denny*, Judge Freedman observed a split in authority on when, in a Title VII context, the burden of proof with regard to a Bennett Amendment affirmative defense shifts to the defendant. He framed this issue as "the question of whether the EPA's burdens of proof are applicable to Title VII equal pay claims." *Id.* at 1155. Like Judge Freedman, I believe that "the very notion of an 'affirmative defense' strongly suggests that, as with other affirmative defenses, the party claiming its benefit has the burden, not just of pleading, but also of persuading the trier of fact by a preponderance of the evidence that the party should prevail on the defense." *Id.*, at 1156. As a result, I, too, am unpersuaded by those courts holding that when traditional Title VII burdens of proof are applied to Title VII equal pay cases, "the defendant carries no burden of proof but merely the duty to articulate a nondiscriminatory reason for pay disparity once the plaintiff has established a prima facie case," even when the defendant asserts a Bennett Amendment affirmative defense. Marie Walsh, *A Judicial Guide to Labor and Employment Law*, § 10–1.24, at 211 (listing courts so holding). If the defendant in a Title VII equal pay case chooses to assert the

fourth affirmative defense of the Bennett Amendment, Title VII does not require the plaintiff to disprove the validity of the. defense. Rather, "under Title VII, the employer bears the burden of showing that the wage differential resulted from a factor other than sex." *Kouba v. Allstate Insurance Co.*, 691 F.2d 873, 875 (9th Cir.1982). I depart from Judge Freedman's analysis in *Denny* only to the extent that he reads *Kouba* to imply that because the defendant in a Title VII equal pay case bears the burden of proving a Bennett Amendment defense, the *McDonnell-Burdine* framework has no relevance to the analysis of burdens of production and persuasion.

5. In 1987, for example, McMillan earned $40,398 as Director of Radiology, while three male peers earned $63,536 (Director of Clinics), $73,423 (Director of Pathology), and $70,000 (Director of Surgery).

6. As McMillan points out, "unlike [in] a Title VII claim, a plaintiff [in an Equal Pay Act case] need not establish that the employer intended to discriminate...." Plaintiff's Opposition, at 15 n. 14.

On the other hand, McMillan has not pointed to any material evidence that suggests that the reasons the MSPCA has articulated for paying her less are a pretext for gender based animus. The testimony of Dr. Arlene Ash, McMillan's statistical expert, who analyzed the pertinent salary figures "and concluded that the salary differential between Dr. McMillan and her peers could not be explained by ... any factor other than sex," Plaintiff's Statement of Facts in Dispute, at 2–3, demonstrates nothing other than what has already been conceded by the defendants—that McMillan was paid less than her male colleagues. The fact that this statistical analysis, if credited, supports an inference that seniority, budget size, and number of employees supervised, do not mathematically explain pay differences among the Department Heads/Directors, does not author the additional necessary inference of intentional, gender based discrimination. Although McMillan correctly points out that she "is not required to come forward with evidence of the 'smoking gun' variety," *Resare v. Raytheon Co.*, 981 F.2d 32, 42 (1st Cir.1992) (quoting *Mesnick v. General Electric Co.*, 950 F.2d 816, 824 (1st Cir.1991)), she is incorrect in equating statistical evidence that might impeach the credibility of her employer's justifications for its pay determinations with evidence that would permit a jury to find that her employer's true motivations were discriminatory. See *LeBlanc v. Great American Insurance Co.*, 6 F.3d 836, 848–849 (1st Cir.1993).

McMillan points to six comments made by four MSPCA veterinarians as indirect evidence of discriminatory animus. Dr. Bernstein, who displayed an advertisement depicting women clad in bathing suits on his office door and placed a photo of a multi-breasted woman in an educational slide show in the early 1980's, is not alleged to have been involved in making salary determinations for McMillan. Dr. Carpenter, who in a similar display of questionable taste, inserted a photo of a nude woman at the end of a slide presentation to the pathology department in the mid 1970's, was also uninvolved in setting salaries. See *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir. 1990) (that co-worker routinely addressed plaintiff in an age discrimination case as "the old man" did not show age animus on the part of the employer where the co-worker played no role in the adverse employment decision). Dr. Thornton is alleged to have commented to McMillan that "it had been a bitch" since the row began over her salary, and to have made suggestive remarks on two occasions to another female employee. Gambardella is said to have told gender oriented jokes prior to his becoming Chief of Staff. "[C]ase precedent clearly reflects that isolated and ambiguous statements ... 'are too abstract, in addition to being irrelevant and prejudicial, to support a finding of [sex] discrimination.'" *Gagne v. Northwestern Nat. Ins. Co.*, 881 F.2d 309, 314 (6th Cir.1989) (quoting *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 n. 2 (6th Cir.1986)). See also *Fontaine v. Ebtec Corp.*, 415 Mass 309, 314, n. 7, 613 N.E.2d 881 (1993); *Greenberg v. Union Camp Corporation*, 48 F.3d 22, 28–29 (1st Cir.1995). Compare *Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 562–563 (1st Cir.1986).

Here, I disagree with the plaintiff, for the reasons stated earlier, that in a Title VII equal pay case, "after the plaintiff establishes a *prima facie* case of discrimination ..., defendants have the burden of *proving* one of the four affirmative defenses enumerated in the EPA and incorporated into Title VII through the Bennett Amendment...." Plaintiff's Opposition, at 16 (emphasis in original). Rather I am of the view that a burden-shifting analysis applies in a Title VII wage discrimination case and that the burden of proving a discriminatory pretext remains with the plaintiff. Therefore, McMillan's Title VII equal pay claim fails.

In light of the Supreme Judicial Court's decision in *Blare v. Husky, supra,* a different analysis applies to McMillan's G.L. c. 151B claim. Because the plaintiff in a 151B case may now carry her burden of demonstrating discriminatory animus on the part of her employer by simply disproving the employer's explanation for its actions, a 151B plaintiff will survive a motion for summary judgment so long as she "has produced evidence sufficient to support a prima facie

case of discrimination, and has further offered evidence sufficient to support a determination ... that the employer's reason was a pretext." *Id.* at 445, 646 N.E.2d 111. In *Blare,* the plaintiff, a 57 year old employee who was ostensibly fired because of a poor disciplinary record, argued that his employer's justification for the termination was pretextual because younger employees with similar records were retained by the company. The Supreme Judicial Court ruled that this was enough to raise a genuine issue of fact not only as to the validity of the employer's proffered reason for the termination, but also as to whether the true motive behind the employer's action was impermissible age based animus. It therefore reversed a grant of summary judgment for the defendant.

■ As discussed above, the statistical evidence McMillan proposes to offer at trial could cause a jury to doubt the validity of the explanation put forward by the MSPCA to justify the pay differences between McMillan and her male colleagues. Thus, the MSPCA's motion for summary judgment on the 151B equal pay claim must be denied.

## II. SEX DISCRIMINATION/RETALIATION

■ McMillan argues that despite the two year time lag between the filing of her MCAD complaint and her termination, a jury willing to look at the "interactions which were occurring during that two-year period" could infer a causal connection between the two. In support of this argument, McMillan notes that the MCAD notified the MSPCA that it would conduct an investigation into McMillan's claims at approximately the same time that she was fired. However, Gambardella and Thornton have submitted sworn testimony in which they deny any knowledge of the MCAD's letter. McMillan asserts without any supporting evidence that there is "no doubt the MSPCA's lawyers apprised them that the MCAD action was proceeding, and this brought the matter to the fore." Plaintiff's Opposition, at 23. This speculation falls to the rule that "motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some day reveal." *Maldonado-*

*Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994). Although "[a] showing of discharge soon after the employee engages in an activity specifically protected by section 704(a) of Title VII ... is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation," *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 110 (1st Cir.1988) (finding no suggestion of retaliation where the EEOC complaint is filed twenty-one months before the employee's termination), as the record stands in McMillan's case, the two events are too disconnected in time to permit a reasonable inference of causation. See *Mesnick v. General Electric Co., supra,* at 950 F.2d 828 (reading *Oliver* to hold that a "long period of delay between [the] initial EEOC complaint and [the] ultimate discharge negates [any] inference of retaliation.")

■ Even if a prima facie case of retaliation were to be assumed, the claim would fail for the same reason that the pay discrimination claim under Title VII is not viable— McMillan is unable to point to any material fact that would permit a reasonable jury to find that the explanation given by Gambardella for her firing was pretextual and influenced instead by a retaliatory motive. The MSPCA argues that McMillan was fired for valid business reasons involving her acrimonious relationships with her peers and supervisors, her ukase that Angell purchase her personal aviary business, and her peremptory refusal to do aviary work as her job otherwise required. Gambardella states that his decision to fire McMillan came after two years of a progressively deteriorating relationship that evolved into outright insubordination. He claims to have received daily complaints about McMillan's attitude from other staff members, and states that she was disruptive at departmental meetings. According to Gambardella, his relationship with McMillan was so strained that he finally told Thornton and the Board of the MSPCA that he would quit if she was not fired. McMillan has submitted third party deposition testimony attesting to her composure during department meetings but has not disputed any of the other facts that Gambardella has offered

to justify her dismissal. Moreover, even if one were to assume that Gambardella acted unreasonably in refusing to authorize the purchase of McMillan's aviary practice, or took undue offense at McMillan's refusal to treat birds, or over-reacted in banning her from Angell's premises, this falls far short of suggesting that Gambardella fired her for pressing her complaint to the MCAD.

## III. CONTRACT CLAIMS

McMillan next argues that the MSPCA's failure to comply with several of the procedures outlined in the Rules and Regulations Memorandum it distributed on March 30, 1990, constituted a breach of contract and a negligent performance of contractual duties. Although an employee handbook may, in some circumstances, give rise to an employment contract, see *Jackson v. Action for Boston Community Development, Inc.*, 403 Mass. 8, 9, 525 N.E.2d 411 (1988), the facts alleged by McMillan do not make this such a case. McMillan does not claim to have bargained for any of the terms of the manual, to have signed the manual, or to have executed any other employment agreement with the MSPCA. Moreover, the manual describes itself as a disciplinary guideline that "is not all inclusive." These facts distinguish McMillan's situation from the cases cited in her brief such as *Goldhor v. Hampshire College*, 25 Mass.App.Ct. 716, 718, 521 N.E.2d 1381 (1988), where disciplinary procedures listed in an administrative manual that was specifically referenced in a signed employment contract were held to be incorporated in that contract, and *Garrity v. Valley View Nursing Home Inc.*, 10 Mass.App.Ct. 822, 406 N.E.2d 423 (1980), where the Court held that the terms of a signed employee manual were incorporated into an existing employment contract.

## IV. TORTIOUS INTERFERENCE WITH ADVANTAGEOUS RELATIONS AND CHARITABLE IMMUNITY

Thornton and Gambardella could not ordinarily be held liable for tortious interference with McMillan's advantageous relations with the MSPCA if their actions "interfering" with those relations were a privileged part of their duties as managers and

employees of the MSPCA. Unlike a natural person, a corporation such as the MSPCA can only act through its officers, employees, and agents. When Thornton and Gambardella terminated McMillan's employment relationship with the MSPCA, they were acting not in their individual capacities but on behalf of the MSPCA. However, the law is clear that when a supervisor with the authority to terminate an at-will employee does so not for a legitimate business reason but rather solely because of the supervisor's personal feelings of malice, the privilege does not apply. *Steranko v. Inforex*, Inc., 5 Mass.App. Ct. 253, 273, 362 N.E.2d 222 (1977); *Gram v. Liberty Mutual Insurance Co.*, 384 Mass. 659, 663, 429 N.E.2d 21 (1981). The internal memo wars between Gambardella and McMillan, their heated verbal exchanges, and Gambardella's ultimatum that there was not enough room at the MSPCA for the both of them, might persuade a reasonable jury that Gambardella fired McMillan for reasons of personal animosity rather than business judgment. The same is not true, however, for Thornton, whose relationship with McMillan was by contrast relatively unperturbed. The motion for summary judgment on the claim of tortious interference with advantageous relations will therefore be allowed with respect to Thornton and denied with respect to Gambardella.

Finally, the MSPCA argues that its tort liability is limited to $20,000 by the charitable immunity statute, G.L. c. 231 § 85K. In response, McMillan contends that the Legislature did not intend G.L. c. 151B claims to be covered by the statute. In support of this view, McMillan quotes language in 151B stating that the statute "shall be construed liberally for the accomplishment of the purposes thereof" and that "any law inconsistent with any provision hereof shall not apply." McMillan concludes from these provisos that immunity from claims greater than $20,000 provided to charities by § 85K should not limit recovery from a charity under 151B.

Were I to read 151B as does McMillan, the refusal to apply G.L. c. 231 § 85K to 151B claims would deny all recovery to victims of discrimination practiced by charitable institutions. Prior to the passage of G.L. c. 231 § 85K, the common law doctrine of charitable immunity insulated institu-

tions like the MSPCA totally from suit. After a warning by the Supreme Judicial Court that it would consider eliminating the charitable immunity doctrine unless the Legislature eased the absolute ban on recovery, see *Ricker v. Northeastern University*, 361 Mass. 169, 279 N.E.2d 671 (1972), the Legislature passed G.L. c. 231 § 85K to permit claims against charities, but only on the condition that any award of damages not exceed $20,000.[7] Section 85K therefore serves as an exception to the common law doctrine of charitable immunity. It does not operate to abolish the doctrine. Without the statute there would be no recovery at all. Because I rule that G.L. c. 231 § 85K does apply to claims brought under G.L. c. 151B, damages may be awarded against the MSPCA, but only up to the $20,000 maximum permitted by the statute. See *Boyle v. Boston Foundation, Inc.*, 788 F.Supp. 627 (D.Mass.1992).[8]

### ORDER

For the foregoing reasons, the MSPCA's motion for summary judgment is *DENIED* with respect to count one of the Complaint insofar as it alleges causes of action under the Equal Pay Act and G.L. c. 151B, and *ALLOWED* with respect to plaintiff's equal pay and retaliation claims under Title VII and G.L. c. 93 § 102. Summary judgment is also allowed for the defendant MSPCA on plaintiff's claims of breach of contract and negligent performance of contractual duties. The motion for summary judgment on the claim of tortious interference with advantageous relations is *ALLOWED* with respect to Dr. Thornton and *DENIED* with respect to Dr. Gambardella. The court further *ADJUDGES* and *DECLARES* that defendant MSPCA's liability for damages under G.L. c. 151B is limited by G.L. c. 231 § 85K to $20,000.

SO ORDERED.

---

**7.** The statute, in pertinent part, reads as follows: "It [charitable immunity] shall not constitute a defense to any cause of action based on tort brought against a ... charity; provided, that ... liability in any such cause of action shall not exceed the sum of twenty thousand dollars exclusive of interest and costs."

**8.** The parties have proceeded on the assumption that 151B claims in fact sound in tort.